**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | :   **CRIMINAL NO. 1:03-CR-360** |
| v. | : |
| | :   **(Judge Kane)** |
| **SYLVESTER MARTIN,** | : |
|     **Defendant** | : |

**MEMORANDUM AND ORDER**

Before the Court are Defendant's motion to dismiss and motion to suppress, and all responsive papers thereto. The Court heard testimony on these motions on March 17, 2004 and July 1, 2004. Also before the Court are several pro se motions. For the reasons that follow, all of the above motions will be denied.

**I.     Background**

Defendant is before this Court for conduct that occurred on August 30, 1998. Harrisburg City Police were summoned to the 2200 Block of Jefferson Street, Harrisburg, at around 9:45 that evening on a report of shots fired. Officer Rodney Shuman was the first to arrive on the scene. Officer Shuman saw Defendant on a porch, approached him and questioned him. Defendant reported that a young black male dressed in black fired a gun in the air and then ran down the alley. Although this information turned out to be inaccurate, Officer Shuman began searching the area for the suspect identified by Defendant. Meanwhile, Officers Doreen Heron and Thomas Ryan arrived on the scene. Officer Heron spoke with Catherine Brannon, a witness, and to Defendant. Smelling alcohol on Defendant and observing his demeanor, she ordered his arrest for public drunkenness. Officer Ryan placed him under arrest and held him in the back of his police car. When Officer Heron ran a warrant check, she verified his address and learned of an active

warrant for a city ordinance violation. Officer Shuman was called back to the scene, where he put Defendant in a police van and then transported him to the police station for processing. On the way to the police station, Officer Shuman received a radio dispatch from Officer Heron requesting that after transporting Defendant, he return to the scene with a camera.

Shortly after Defendant's arrest, Ms. Jackson, a neighbor and complaining witness, told Officer Heron that a small child remained in Defendant's house, most likely in the front bedroom. Fearing for the safety of an unattended child with a weapon still unaccounted for, the Officers approached the house. As they did, Officer Heron observed spent bullet casings, an open beer can, and folding chairs on the porch, and the front door open. Officers Heron and Ryan identified themselves as Harrisburg Police Officers and called out repeatedly. When no response came, they announced themselves and entered the house through the open door, calling out continuously as they did. Pursuant to Police procedure, Officer Heron went upstairs to the second floor and Officer Ryan stayed on the first floor, conducting "sweeps" of the rooms in an effort to locate the child.

Officer Ryan walked the first floor from front to back, performing a sweep search of the living room, dining room, and then the kitchen located at the back of the house. From the doorway of the kitchen, he was unable to observe an open area between the refrigerator and the back wall of the house. That area was large enough to accommodate a child, so the Officer inspected it. As he did, he observed an open kitchen cabinet directly in front of him with a gun lying on the shelf. Officer Ryan called out to Officer Heron.

As these events transpired on the first floor of the home, Officer Heron was canvassing the upstairs rooms in search of the child. At almost the exact time Officer Ryan saw the weapon, Officer Heron located Tariq Martin, Defendant's son, in the bedroom nearest the front of the

house.  The Officers did not disturb the scene until Officer Shuman returned with the camera and photographed the house and the evidence.

A criminal complaint was filed against Defendant in the Dauphin County Court of Common Pleas, charging him with reckless endangerment, false reports to law enforcement authorities, disorderly conduct, public drunkenness, and firing weapons within city limits.  A preliminary hearing was scheduled for October 1, 1998, but was re-scheduled at the request of Defendant's attorney and held on January 22, 1999.  District Justice James Pianka found probable cause to hold Defendant and set an arraignment in the Court of Common Pleas for Dauphin County on March 26, 1999.  The Commonwealth filed a criminal information charging the Defendant on March 15, 1999.

Although Defendant received notice for the arraignment, he failed to appear on March 26,1999.  As a result, a capias issued for Defendant's arrest.  At some point thereafter, state authorities entered Defendant into the National Crime Information Center ("NCIC").

On October 31, 2000, Defendant was arrested in Prince William County, Virginia, and on the same day, pursuant to the NCIC entry, the Commonwealth was notified of his arrest.  Chief Carl Garver of the Dauphin County Criminal Investigation Division communicated to the Manassas, Virginia police department the Commonwealth's interest in extraditing Defendant.  A bond hearing was held on December 7, 2000, and bail was denied.  On December 20, 2000, Defendant filed a notice of his intention to waive extradition, however the certified copy of the waiver of extradition form indicates that Defendant never signed the form.  A fugitive hearing was held, and Defendant was release on $500 bail.  Subsequently, the fugitive charges were dismissed.  Chief Garver testified that after Defendant's arrest, he contacted Prince William County approximately every thirty days until he learned that the fugitive charge was dismissed.  (Carl

Garver Transcript at 14, ln. 24).  Afterwards, other than re-entering Defendant's information into NCIC in April of 2001, the Commonwealth took no further action to secure Defendant's extradition and had no further contact with Virginia.

Defendant was arrested on the same capias on October 20, 2002 in Alexandria, Virginia. This time, the Commonwealth secured a Governor's Warrant, and Defendant was extradited to Dauphin County, Pennsylvania on January 21, 2003.  Subsequently, a jury trial was held in state court on May 15, 2003, which ended in a mistrial when the jury accidently saw Petitioner in handcuffs.  Defendant's defense attorney, Kristen Weisenberger, who worked for the Public Defender's office, then joined the Dauphin County District Attorney's office as a prosecutor.  On November 10, 2003, the District Attorney's Office formally referred Defendant's case to federal authorities, who presented the facts to a federal Grand Jury under the Armed Career Criminal Statute.[1]  The Grand Jury returned an indictment against Defendant on December 10, 2003.

## II. Motion to Dismiss

On January 13, 2004, Defendant filed a motion to dismiss the indictment.  (Doc. No. 22.) After a hearing, the Court denied Defendant's motion to dismiss the indictment in part by Order dated May 19, 2004.  (Doc. No. 56.)  On July 1, 2004, the Court held an evidentiary hearing regarding Defendant's claim of vindictive prosecution, during which Defendant indicated that he wished to fire his attorney and retain new counsel.[2]  Despite this, the Court allowed Mr. Bickley,

---

[1]The Dauphin County Deputy District Attorney, who is cross-designated as a Special Assistant United States Attorney and the prosecutor in this case, represented to the Court that it was she who initiated the federal charges pursuant to her duties under the Project Safe Neighborhoods, a federally funded program designed to refer state charges for federal prosecution, with more severe penalties. (March 17, 2004 Suppression Hearing Transcript at 18).

[2]    The Court notes that Mr. Bickley is the third attorney Defendant has found inadequate in the case at bar.

Defendant's attorney, to put forth evidence of vindictive prosecution. At the end of the hearing, the Court left the record open and gave Defendant thirty days to retain new counsel. Another hearing was scheduled for August 2, 2004. On August 2, 2004, Defendant failed to appear. The Court issued a bench warrant for Defendant's arrest and Defendant was soon located when he was arrested in Virginia on other state charges. On December 15, 2004, the Court ordered Defendant to show cause why the Court should not consider the record closed and rule on Defendant's pending claims (Doc. No. 82), to which Defendant timely filed a response (Doc. No. 83). Having been given amble opportunity to present testimony on this matter, the Court shall now consider the record closed. Accordingly, the Court will now address Defendant's claim of vindictive prosecution.

### A.     *Vindictive Prosecution*

Defendant argues that the circumstances leading up to this federal prosecution demonstrate that the federal charge against him was brought vindictively, in retaliation for his uncooperative behavior with state authorities and insistence that he be granted another jury trial after the mistrial. Defendant points to the exposure to much higher penalties on the federal crime and the fact that his previous defense attorney, who he had persistently accused of being ineffective, joined the very office where the decision to bring federal charges was made.

To establish prosecutorial vindictiveness, Defendant must either: (1) show facts that give rise to a presumption of vindictiveness; or (2) offer evidence of the prosecutor's actual vindictiveness. United States v. Paramo, 998 F.2d 1212, 1220 (3d Cir. 1993). Under the first test, Defendant must offer evidence that demonstrates a "realistic likelihood of vindictiveness." Id. (quoting Blackledge v. Perry, 417 U.S. 21, 27 (1974)). If he does so, the burden shifts to the Government to rebut the evidence with legitimate, objective reasoning for their actions, which if

met, drops the presumption of vindictiveness so that Defendant must show actual vindictiveness in order to prevail.  Id.

In order to establish a presumption of vindictiveness, a showing of bad faith or actual malice on the part of the prosecutor is not required.  Blackledge, 417 U.S. at 27; United States v. Oliver, 787 F.2d 124 (3d Cir. 1986).  Rather, a defendant can show that the opportunities for vindictiveness arise in such a case as his that would create an opportunity to retaliate against a defendant for exercising his legal rights.  Id.; United States v. Goodwin, 457 U.S. 368, 378 (1982).  Thus, in Blackledge, the Court held that in North Carolina's two-tiered judicial system, a defendant must not be penalized for invoking his statutory right to a new trial de novo by being subject to more serious charges.  417 U.S. at 27-29.  Similarly, the Court has held that a presumption arises where a harsher sentence is imposed on re-trial following a successful attack of an original conviction.  North Carolina v. Pearce, 395 U.S. 711 (1969).  The presumption can be overcome only if the sentencing judge uses objective information in the record and specifies the reasons justifying an increased sentence.  Id. at 726.  By contrast, pre-trial prosecutorial discretion that leads to more serious penalties has been allowed where it was part of the "give and take" in plea negotiations.  See Goodwin, 457 U.S. at 372 (allowing the prosecutor to threaten felony charges if the defendant did not plead guilty to misdemeanor charge from the same incident); Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) (re-indicting defendant to bring more serious charge was not a due process violation when defendant refused to plead guilty on lesser charges).

The Goodwin Court distinguished its decisions from cases applying a presumption in post-trial settings, noting that "a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision."  457 U.S. at 381.  However, the Third Circuit has refused to apply the presumption even in post-trial settings.  In

United States v. Esposito, following a criminal defendant's acquittal by a jury, the Government brought another indictment for separate crimes based on the same underlying conduct.  968 F.2d 300 (3d Cir. 1992).  The Court analyzed the vindictiveness jurisprudence at length and concluded that the presumption was not applicable where the Government had legitimate reasons for its actions, as the action "was too far removed from the right [defendant] exercised" and no action of the Government impeded the defendant's exercise of his rights.  Id. at 304-305.  Furthermore, the Court indicated that the defendant's acquittal was "a legitimate prosecutorial consideration" in determining whether to bring additional or more serious charges.  Id. at 304; see also United States v. Martinez, 785 F.2d 663 (9th Cir. 1986) (defendant's acquittal on unrelated charges was legitimate motive for bringing new indictment); United States v. Allen, 699 F.2d 453, 461 (9th Cir. 1982) (government's decision to prosecute based on severity of sentence in unrelated case did not create presumption of vindictiveness).

     Here, Defendant claims that in his earlier case following the mistrial, state authorities threatened to turn his case over to federal authorities if he would not plead guilty.  (Doc. No. 23 at 5).  Defendant argues that this is "upping the ante" in retaliation for exercising his constitutional right to a trial by a jury, forbidden by Blackledge and other precedent.  Even if this were the case, there is not a realistic likelihood of vindictiveness that would compel the inference that during mid-trial plea negotiations, the Government should not be able to threaten to do what it could otherwise legitimately do.  As in Esposito, the potential for federal charges existed regardless of whether Defendant chose to pursue the jury trial in state court.  968 F.2d at 305.  Thus, the Court does not find a presumption of vindictiveness here.

     Defendant can still prevail by proving actual vindictiveness by the prosecutor.  Paramo, 998 F.2d at 1220.  Meeting the burden of proof for actual vindictiveness, on the other hand, is

"exceedingly difficult to make." Id. at 1221 (quoting United States v. Meyer, 810 F.2d 1242, 1245 (D.C. Cir. 1987)).  The validity of the charge must be balanced against the broad discretion of a prosecutor in deciding whether to bring charges.  Bordenkircher, 434 U.S. at 364.  Selectivity in enforcement is "not in itself a federal constitutional violation so long as the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Id. (quoting Oyler v. Boles, 368 U.S. 448, 456 (1962)) (internal quotation marks omitted).  While this case tests the system's tolerance for the limits of prosecutorial discretion, Defendant has presented no evidence that the prosecutor was actually retaliating against him for exercising his rights or that she lacks a legitimate reason for presenting the case to the Grand Jury.  Accordingly, the motion must be denied on these grounds.

### III.     Motion to Suppress

On January 13, 2004, Defendant filed a motion to suppress certain evidence.  (Docs. No. 24.)  Defendant argues that the gun seized during the warrantless search of his residence must be suppressed because the search was a violation of the Fourth Amendment.  Defendant argues that because he was arrested outside of his home, a search of the home was not necessary and that even if it was justified under the circumstances, the officers were not permitted to search for the firearm or open the kitchen cupboard where the gun was located.   The Government argues that the plain view doctrine allowed them to seize the gun once the officers were lawfully in Defendant's home due to the exigent circumstances.

The Supreme Court has established the "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Groh v. Ramirez, 124 S.Ct. 1284, 1290 (2004) (quoting Payton v. New York, 445 U.S. 573, 586 (1980)).

Thus, "warrantless searches and seizures in a home violate the Fourth Amendment absent consent or exigent circumstances." Griffin v. Wisconsin, 483 U.S. 868, 883-84 (1987) (collecting cases).

In this case, the Government argues that the entry into Defendant's home was justified by the report that a six-year old child had been left alone inside the residence. Moreover, the officers legitimately believed that the child was in potential danger because there were shell casings on the front porch, though no gun was found there or on the Defendant's person, and an eye-witness reported that Defendant had briefly returned to his residence after firing the gun. Under these circumstances, the Officers were permitted to make a warrantless entry into the residence. See Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 298-99 (1967) (officers acted reasonable in entering a house to search for a man after being informed that an armed robbery had taken place, and that the suspect had entered the house less than five minutes earlier); United States v. Morgan, 33 Fed. Appx. 603, 605-06 (3d Cir. 2002) (sound of repeated flushing of a toilet gave rise to exigent circumstances that evidence of criminal activity was being destroyed); United States v. Guarente, 810 F. Supp. 350, 353 (D. Me. 1993) (officers received 911 call regarding domestic dispute and when they arrived heard man yelling "he's got a gun"). Although Defendant raises several other possibilities the officers might have pursued at the time, such as finding a relative who could watch after the child, it is not for this Court to second-guess from the perspective of hindsight the split-second decisions officers on the scene are required to make. See Warden, 387 U.S. at 298-99 ("the Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others"); United States v. Myers, 308 F.3d 251, 273 (3d Cir. 2002) (commenting on the court's concern over second guessing an officer's split-second judgment as to the danger posed by a weapon). Thus, Defendant's rights were not violated by the entry.

The Government next argues that the seizure of the firearm from Defendant's home was lawful because Officer Ryan discovered it in plain view while he and Officer Heron searched the house for the child.  To justify a warrantless seizure based on the plain view exception, the Government must satisfy three conditions.  First, the seizing officer must not have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." Horton v. California, 496 U.S. 128, 136 (1990).  Second, the item must not only be in plain sight, but "its incriminating character must also be immediately apparent."  Id. (quotation omitted). Finally, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."  Id. at 137.

The first element has already been established above; exigent circumstances existed such that Officers Ryan and Heron were legitimately on the premises.  Further, Officer Ryan testified in response to questioning by the Court that he was required to enter the kitchen to look for the child because there was an area in the room behind the refrigerator where a child could hide that could not be seen from outside the room.  (Suppression hearing Transcript at 76-77).  Second, the incriminating character of the firearm in this case is clear.  Police had arrived at the scene in response to a report of shots fired, and the officers observed spent shell casings on the porch outside the residence, but had not recovered a gun after searching Defendant upon his arrest. Thus, the Officers had probable cause to believe that the firearm in the cupboard was evidence of a crime.  See Arizona v. Hicks, 480 U.S. 321, 326 (1987) (probable cause is required to invoke the plain view doctrine where the seizure is unrelated to the original exigencies justifying warrantless search).  Finally, because the officers were permitted to search the house for the child and the gun was in plain view from the kitchen, Officer Ryan had lawful access to the gun.  See United States v. Ross, 456 U.S. 798, 820-21 (1982).  Therefore, the seizure of the firearm in plain view while

the Officers legitimately entered Defendant's home to secure the welfare of his child was lawful. Accordingly, the motion to suppress the gun as evidence will be denied.

## IV. **Pro se Motions**

Although he has at all times in these proceedings been represented by counsel, Defendant has filed several motions pro se. This interferes with the smooth functioning of the case and hinders this Court's ability to consider all pre-trial matters in a timely fashion. See United States v. Boone, Crim. No. 00-3, 2002 WL 31761364, *3 (D.N.J. 2002) (noting that defendant was warned that continued filing of pro se motions would subject him to sanctions for contempt of court and/or obstruction of justice). This Court may dismiss these motions on this ground alone. See United States v. Hirschfeld, 911 F. Supp. 200, 201 (E.D. Va. 1995) (collecting cases holding that 28 U.S.C. § 1654 allows parties to proceed pro se or with counsel, but not both); Non-Punitive Segregation Inmates of Holmesburg Prison v. Kelly, 589 F. Supp. 1330, 1335 (E.D. Pa. 1984) ("Ordinarily, a court will not consider pro se submissions from a party represented by counsel."). But see United States v. Zimmerman, 2001 U.S. Dist. LEXIS 8147 (E.D. Pa. 2001) (declining to "dismiss any pro se motions filed by a defendant already represented by an attorney"). Despite the above, the Court will address the pending pro se motions in turn.

On January 21, 2004, Defendant filed a pro se motion seeking four types of relief. (Doc. No. 29). First, he asks this Court to enter a protective order against the Dauphin County police and others to stop harassing him and pursuing an unjust prosecution. This Court does not have jurisdiction to order the relief sought. Therefore, the motion will be denied. Next, Defendant asks for an "estoppel in the proceedings," which the Court will construe as a motion for a continuance. Because Defendant's trial date has already been continued pending adjudication of Defendant's

pretrial motions, this motion will be denied as moot.  Third, Defendant asks for a change of venue.  Defendant states that he feels that the prosecutor in this case cannot give him a fair trial, and as such, is not asking for a change in venue so much as a change in prosecutor.  Neither Defendant nor this Court can pick the attorney who will prosecute this case, and dissatisfaction with the prosecutor is certainly not grounds for a change in venue.  See Fed. R. Crim. P. 21 (grounds for transfer of trial to another venue); United States v. Smith, 918 F.2d 1551 (11th Cir. 1990) (defendant failed to establish that he would be so prejudiced by trial of his case in the district where the offense was committed that he could not receive a fair trial there).  Defendant has not shown that he will be prejudiced by facing trial in the Middle District, where the offense charged was committed.  See U.S. Const. Art. III, § 2, cl. 3; Fed. R. Crim. P. 18 (providing that the trial shall be in the state where the crime was committed); Sheppard v. Maxwell, 384 US 333, 363 (1966) (movant bears the burden of showing a "reasonable likelihood" of unfairness).  Thus, this motion will also be denied.  Finally, Defendant asks for a change of attorney.  At the time, he was represented by James West, who has since withdrawn from this case.  Therefore, this motion will be denied as moot.

On March 24, 2004, Defendant filed, pro se, a motion for recusal (Docs. No. 48), asking that the case before this Court be transferred to the Honorable Sylvia H. Rambo.  Defendant details his problems with his two court-appointed lawyers and states that he was told by Mr. Abeln that Judge Rambo is a fair judge.  Although he apparently feels that he would be happier before Judge Rambo, Defendant states no basis for his motion for recusal of this Court beyond his displeasure with the Court's dismissal of certain pre-trial motions.  See 28 U.S.C. § 455 (specifying reasons for disqualification of judge).  Accordingly, this motion will also be denied.

## VI. ORDER

Therefore, for the reasons discussed above, **IT IS ORDERED THAT**:

1. Defendant's motion to dismiss the indictment (Doc. No. 22) is **DENIED**.

2. Defendant's motion to suppress (Doc. No. 24) is **DENIED**.

3. Defendant's motion to disclose favorable evidence (Doc. No. 26) is **DENIED** without prejudice to refile.

4. Defendant's pro se motion to Change Attorney, Change Venue, and for Protective Order (Doc. No. 29) is **DENIED**.

5. Defendant's pro se motion for recusal (Doc. No. 48) is **DENIED**.

As Defendant is currently awaiting trial in Virginia State Court on unrelated charges, **IT IS FURTHER ORDERED THAT** the Government shall file a report informing the Court of the status of the above captioned matter within ten days of the date of this Order.

S/ Yvette Kane
Yvette Kane
United States District Judge

Date: April 18, 2005